# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

DANIEL MARSH, JR.,          :

         Plaintiff,       :     CIVIL ACTION NO. 3:23-899

     v.             :       (JUDGE MANNION)

A. STRATTON, counselor, *et al.*,  :

        Defendants.    :

## MEMORANDUM

## I.    BACKGROUND

*Pro se* Plaintiff Daniel Marsh, Jr. ("Marsh" or Plaintiff), a convicted state prisoner, commenced this action by filing a complaint, which the Clerk of Court docketed on June 1, 2023. (Doc. 1.) In the complaint, Marsh named as Defendants: (1) A. Stratton ("Stratton"), a counselor at Pennsylvania State Correctional Institution at 1100 Pike Street, Huntingdon Pennsylvania ("SCI Huntingdon"); (2) J. Rivello ("Rivello"), Superintendent at SCI Huntingdon; (3) Johnny Johnson ("Johnson") of the Pennsylvania Board of Pardons and Parole ("Parole Board");[1] and (4) the Secretary of the Commonwealth of Pennsylvania Department of Corrections ("DOC Secretary"). (*Id.* at 1–3.)

---

[1] Marsh misspells "parole" as "paroll" in the caption and body of the complaint. (Doc. 1 at 1, 3.) The Court uses the proper spelling in this Memorandum.

Marsh alleges that on the morning of October 27, 2021, Stratton called him into his office at SCI Huntingdon. (*Id.* at 4, 11.) While there, Stratton told Marsh that "Harrisburg Official(s)" directed him to get Marsh ready for release. (*Id.* at 4, 11.) Upon hearing this, Marsh was "overwhelmed" and asked Stratton to confirm that he was being released. (*Id.* at 4.) Stratton told Marsh that "it's true," and pointed out that he was on the computer with them now. (*Id.*) After doing "some things on the computer," Stratton told Marsh that "they are processing you out," "you are out of here," and "you are a free man." (*Id.*)

Stratton stated that because Marsh had been in prison for over thirty-five (35) years, Marsh needed a state identification. (*Id.*) To get Marsh his state identification, Stratton explained to him that all Stratton needed was Marsh's birth certificate and social security card. (*Id.*) Stratton asked Marsh whether he had his birth certificate and social security card, and Marsh indicated that he did. (*Id.*)

Marsh left Stratton's office and later returned with his birth certificate and social security card. (*Id.* at 4–5.) Stratton took them from Marsh and said he needed to copy them so he could send the copies to Harrisburg. (*Id.* at 5.) Stratton also told Marsh that he needed to sign a document to obtain his state identification. (*Id.*) Stratton grabbed a paper among the papers

scattered on his desk and held it down for Marsh to sign. (*Id.*) When Marsh tried to lift the paper to read it, Stratton continued to hold down the paper and said "this is just for your state I.D., you are outta here." (*Id.*) Marsh then asked Stratton for a copy of the document, which Stratton said he would give him. (*Id.*) Believing he would get a copy of the document, Marsh signed it. (*Id.*) Stratton then told Marsh that everything was good to go and all they had to do now was wait for Harrisburg to contact Rivello to arrange for Marsh's release. (*Id.* at 6.) Stratton never gave Marsh a copy of the document. (*Id.*)

Marsh asserts that Stratton "insidiously/surreptitiously" held down the paper for Marsh to sign, and he trusted in Stratton's "ethical/fiduciary duty" when signing it. (*Id.* at 5.) Marsh did not know that Stratton "had gained [his] essential documentation illegally and unlawfully upon a false/fraudulent claim [that] Harrisburg – Johnny Johnson – the Governor's Office of Pardons/Parole had sent him to acquire for [his] release." (*Id.* at 5–6.) Marsh characterizes this as a "scam," for which he has now uncovered the "malfeasance." (*Id.* at 6.)

Later that day, Marsh wrote a letter to the "Pardons Case Specialist" in which he indicated as follows:

> Today, Wed. Oct. 27/21 [sic] I sat and talked with Counselor Stratton at SCI Huntingdon. In speaking with Counselor Stratton, I recognize the need to again assert my absolute innocence[] and complete exoneration for the crime that

- 3 -

> I have been imprisoned for . . . the past (37) [sic] years. I cannot, would not, and will not accept a penance to my freedom[,] independence, life, and liberty, for a crime I had nothing at all to do with.
>
> Mr. Stratton put before me a document for a said "PA State I.d. [sic]." I did not get a copy of that document as agreed. Therefore I must disavow, disclaim, deny[,] and negate any document that may be used to hold me in accountability [sic] in anyway [sic] that was presented . . . by Mr. Stratton on this day of Wed. Oct. 27/21 [sic]. For the means in which my signature was obtained was not forthright and true. This is a written sworn declaration of my own hand, heart, mind, and being.

[*Id.* at 7; Doc. No. 1-8 at 2–3.]

On October 28, 2021, Marsh completed an Inmate's Request to Staff Member directed to Stratton. (Doc. 1 at 7; Doc. 1-1 at 2.) In the Request, Marsh stated:

> On 10-27-21 [sic], you and I had, an, what I thought was a consenial [sic] meeting. Regarding Johnny Johnson in Harrisburg regarding my absolute innocence [and] wiping of my record and complete exoneration. I brought you a copy of my birth certificate and s.s. card. I signed a form regarding state I.D. but I did not get a copy of that form. I would like to have a copy for my file if I may please. I like to keep things, all things above board. For in my matter as you, yourself have seen records and documents disappear, or are lost, or missing, or distorted. I only want to keep all things clear and understanding for the record. I only signed (1) one document with you this day. Remember you were moving about setting copies and facing, e-mailing, etc.

(Doc. 1-1 at 2.) It appears Marsh responded to the Request that same day by stating: "Not sure I can give you a copy of the application but I gave the

original to clerk for processing. The other was placed in your file and I documented it on the computer so we're all good." (*Id.*)

The following day, Marsh submitted another Inmate's Request to Staff Member to Stratton. (Doc. 1 at 7; Doc. 1-7 at 2.) In this Request, Marsh stated:

> Oct. 27/21 [sic] you and I our [sic] first meeting ever. It was agreed upon that all documents and filings [sic] copies would be provided. You attained [sic] my signature for a said state I.d [sic] You attained [sic] my signature and attached it to and with other documents – documents that I did not know of/am not aware of. You obtained my signature by guile and cunning – now you say that you are not sure that you can give me a copy. The process is one of disclosure and transparency. It is not one of latency and subterfuge. The process is now tainted cannot be dependable and relied upon. The process must now be suspended – all documents must be presented/provided to me and reviewed by me – no hocus pocus/slight of hand maneuvers.

(Doc. 1-7 at 2.) Stratton did not respond to this Request. (Doc. 1 at 7.)

Marsh avers that Stratton "received [an] e-mail" containing Marsh's October 27, 2021 letter to the Pardons Case Specialist on November 8, 2021. (Doc. 1 at 7, 11.) Then on December 6, 2021, Stratton "orchestrated" to have Marsh take a PennDOT photo identification picture. (*Id.* at 7, 11, 12.)

On December 9, 2021, Marsh submitted an Inmate's Request to Staff to the "Records/Record Officer" in which he sought the following "needed documents": (1) his presentence investigation report; (2) his October 27, 2021 state identification application; and (3) a "1987 appeal filed by the state

District Attorney's Office." (*Id.* at 8; Doc. 1-10 at 2.) Marsh received a response to the Request on December 10, 2021, stating, "The records office can't send you documents that were not originally originated by the DOC. You will have to contact the courts for requests #1 [and] #3. For request #2, you will have to contact inmate accounts." (Doc. 1-10 at 2.) He followed upon this response by submitting an Inmate's Request to Staff Member to the "Inmate Accounts Officer" on December 13, 2021, in which he asked for a copy of his October 27, 2021 state identification application. (*Id.* at 3; Doc. 1 at 8.) He received a response indicating that they "do not process ID applications" and directing him to "[c]heck with your counselor." (Doc. 1 at 8.) Marsh asserts that these responses show that "only Stratton/others know what was actually done – and the absence of the mystery/elusive/document [sic]." (Doc. 1 at 8.)

In January 2022, Marsh sent two letters to "Harrisburg." (*Id.*) On January 22, 2022, Marsh sent a letter asking whether Johnny Johnson or anyone else "in that office direct/instruct" Stratton to "access and copy" Marsh's birth certificate and social security card. (*Id.*; Doc. 1-8 at 4.) Then, on January 27, 2022, Marsh sent a letter to the "Pardons Case Specialist," stating in pertinent part as follows:

> On <u>Wed</u> [sic] Oct. 27/21[,] Counselor Stratton of SCI Huntingdon, what I did'nt [sic] know then, what I now know, came

- 6 -

to me acting under a false pretense – fraud – claiming to be acting on behalf of this office[,] namely Johnny Johnson[,] to gain access to and to copy essential identification – Birth Certificate and Social Security Card.

Mr. Stratton stage/acted/and performed as if he was in actual contac [sic] with this office and there has been no evidence of that. I would like to commend Mr. Stratton for his performance, one to be remembered. Ethical, fiduciary duty completely disregarded.

Identity theft is real, does this office know why (he) Mr. Stratton wanted my birth certificate and social security card, and what he intends to do with it? or [sic] have done with it. how [sic] it could be or would be used. Again these are essential documents. Mr. Stratton initiated contac [sic] with me.

(Doc. 1-8 at 5–6; Doc. 1 at 7.) Marsh did not receive a response to either letter.[2] (Doc. 1 at 7.)

During the "early morning hours" of February 7, 2022, Stratton arranged for Marsh to receive a call in Stratton's office. (*Id.* at 7, 11, 12.) Marsh spoke with someone on the phone who was allegedly from Harrisburg. (*Id.* at 7, 11.) This person told Marsh that they could help him with his release only if he changed his plea from "being innocent [] to guilty." (*Id.* at 7, 11.) Marsh questioned why he would have to do that and told the person on the

---

[2] Marsh alleges that even though he did not receive responses from "Harrisburg" to his letters, "someone there" was copying his letters and sending them to Stratton. (Doc. 1 at 12.) Marsh finds this "eerily predatory," and shows that Stratton believes that "he is above all laws or regard for the rule of law." (*Id.*)

phone that he would not change his plea because he was "an innocent man" and planned to "continue . . . the fight." (*Id.* at 7–8, 11.)

On February 16, 2022, Marsh again met with Stratton "under the guise" that Stratton was "still making preparations for [Marsh's] release." (*Id.* at 8, 11–12.) Then, on March 25, 2022, Marsh wrote another letter to "Harrisburg" in which he "spoke of scam/fraud," "how documents were unlawfully/illegally obtained," and "how Stratton [had] now created yet another document trying yet again to gain my signature of which I did not give." (*Id.* at 8; Doc. 1-9 at 2.)[3]

On October 11, 2022, Marsh submitted another Inmate's Request to Staff Member to Stratton. (Doc. 1 at 13; Doc. 1-13 at 1.) In this Request, Marsh stated as follows:

> On Oct. 27/21 [sic], I was called to your office by you. You said that Harrisburg officials [sic] Johnny Johnson told you to ready me for release. What was needed was my birth certificate [and] s.s. card. I wrote to you Fri [sic] Oct. 29/21 [sic] for you obtained my signature and essential documentation by guile and cunning

---

[3] In making this allegation, Marsh appears to rely on a Pennsylvania Department of Corrections ("DOC") "DC-43 Integrated Correctional Plan" printed on March 2, 2022, which states, *inter alia*, that Marsh had a "General Expectation" of "Secur[ing] Forms of Identification." (Doc. 1-9 at 2.) This "General Expectation" included a comment indicating: "BC & SSC copies on file at HUN. PA ID app. sub." (*Id.*) It is very much unclear that this document represents anything other than the DOC having Marsh's birth certificate and social security card on file and that an application was submitted for a Pennsylvania Identification for Marsh.

> for you did not give me a copy of that document that was agreed upon for the transparent procedure.
>
> Still to date you have not responded to my request. I am still awaiting your response.

(Doc. 1-13 at 1.) Stratton supplied the following response to the Request on October 13, 2022:

> NO, You [sic] are mistaken. I did NOT tell you we were to "ready you for release." What you refer to is the Commutation/Pardon Process. If you recall, you spoke directly with Mr. J. Johnson and he attempted to clarify the process to/for you. However, you were adamant in your position that you would only want processed [sic] for a Pardon and not a Commutation.
>
> As for the other part, We/DOC staff are to work with inmates to attempt to acquire for you all ID documents, including birth certificate, social security card and PA Photo ID through PennDOT. Copies of your social card and birth certificate are on file with our Jail. You are not permitted to have this information inside the jail.
>
> If you submitted a request slip, I would have answered it just as I am this one. Sorry, I'm too busy and don't have time to trick someone or play games. I only try to do what is asked of me by my superiors. If you are someone chooses to refuse, then it is the individual's choice. A copy of this has been provided to your Counselor, Mr. Walters. Your Unit Manager is Mr. Banks, not Mr. Eckenrod. Thanks.

(*Id.*)

On October 23, 2022, Marsh filed a grievance (no. 1003657) in which he grieved as follows:

> Policy: DC ADM 804 sec. A.11. On Oct. 15/22 [sic] Grievant received a response from Mr. Stratton as it relates to the matter

- 9 -

complained herein. This grievance follows. The grievance is timely and the matters [and] dates falls [sic] within the Grievance Policy DC ADM 804 sec. A.11, making the grievance ripe for review. In violation of the U.S. Const. 4th, 5th, 14th amend – Pa. Const. laws – statutes – A scam, fraud, malfeasance present. On Oct. 27/21 Counselor A. Stratton called me to his office – told me that Harrisburg officials/Johnny Johnson told him to ready me for release absolute innocence wiping of record complete exoneration. Ex [sic] 1. He told me that they were processing me out. I needed a state i.d. [sic]/and for that I needed my birth cert. s.s. card. At issue there is no evidence that Harrisburg/anyone directed Stratton to get from me and copy essential documentation.

Believing that Stratton was directed by Harrisburg Pardons I sent a letter Ex [sic] 2. I again wrote to Stratton that by guile/cunning he attained [sic] my documents/signature Ex [sic] 3 he did not respond. Dec. 6/21 [sic] Stratton orchestrated for me to take a photo for PennDOT I.d. [sic]. Dec 9 21 [sic] I wrote to Records about document in question Ex [sic] 4a-4b. Jan. 7/22 [sic] I again wrote to Pardons Board Ex [sic] 5. Jan. 27/22 again wrote to Pardons Ex [sic] 6 detailing Stratton's actions. Feb. 7/22 Stratton orchestrated a phone call sent for me to be in his office. SA Block in the Am hours to speak to someone. This person said to me that they could help me if I changed my plea from innocent to guilty. My response to this can be verified. I am certain that all calls incoming/and [sic] outgoing are docketed/recorded. March 25/22 [sic] again wrote to the Pardons Ex [sic] 7. Note: My essential documents are already on file record in Harrisburg Ex [sic] 8. The Pardons Appli. [sic] does not request copies of birth certificate s.s. card. The woman who corrected my applic. [sic] her name is Ms. K. Callear – not Johnny Johnson. This device/all the ongoings is Strattons [sic] doing. He names Johnny Johnson. I did not know Stratton/I do not know Johnny Johnson. Strattons [sic] extremely delayed response lends visa [sic] for examination – approved validity – relief: Damages – actual, compensatory, consequential, double, exemplary, expectation, emotional distress, pain/suffering, exemplary (punitive).

(Doc. 1-16 at 13–14.)

Via a Rejection Form dated October 26, 2022, Marsh's grievance was rejected because it was not submitted within fifteen (15) working days after the events upon which his claims were based. (*Id.* at 6; Doc. 1 at 13.) Marsh then filed an appeal to the Facility Manager, claiming that his grievance was improperly rejected because he had submitted it within fifteen (15) days after receiving Stratton's October 13, 2022 response to his October 11, 2022 request. (Doc. 1-16 at 7; Doc. 1 at 13.)

Via a Facility Manager's Appeal Response dated November 21, 2022, Rivello upheld the rejection of the grievance, explaining as follows:

> In reviewing your initial grievance and appeal, I note your original grievance was rejected because the grievance was not submitted within fifteen working days after the events upon which claims are based and the grievance does not indicate that you were personally affected by a Department or facility action or policy. In your appeal to this grievance, you claim you filed your grievance within 15 days of receiving the 10/13/22 request slip response from your counselor, therefore, timely [sic]. You also provided documents showing the back-and-forth exchange between you and Counselor Stratton to support your issue. You claim your initial grievance stated how you were affected by Mr. Stratton's actions. Upon review of your initial grievance, I find all the dates in the documentation you provided, clearly show that your event actually occurred back in October 2021; furthermore, you provided request slips from October 2021 and December 2021 and then nothing until October of 2022; therefore, your grievance is untimely. You could have filed a grievance back in 2021, however, you tried to initiate a new event date by writing another request slip to Counselor Stratton, which was almost an entire year after the relevant event; furthermore, Counselor Stratton hasn't been your counselor since April 2022. You could

have resubmitted your grievance, clarifying your grievance, however, instead you chose to appeal. I must agree, grievance #1003657 has been properly rejected.

(Doc. 1-16 at 8; Doc. 1 at 13.)

Via a document dated December 5, 2022, Marsh appealed Rivello upholding the rejection of his grievance to the "Chief Hearing Exam." (Doc. 1 at 13; Doc. 1-16 at 15.) Marsh's appeal stated:

This appeal arises from the rejection of Grievant's grievance by the Facility Grievance Co-ordin./The Facility Mngr. [sic] Agreement thereto – Grievant avers that is an error-said grievance was submitted within (15) fifteen working days – to reiterate the predicate of grievant filing the grievance was (is) based on receiving a response from Mr. Stratton dated Oct. 15/22 [sic] Ex. Herein. Grievants [sic] grievance was filed Oct. 23/22 [sic] well within (15) fifteen working days. Moreover in accordance with Dept. policy DC ADM 804 section A-11. Grievant made reference to the back and forth exchange with counselor to support his issue. All allowed by Policy. (2ndly [sic]) Secondly Grievant does state within the grievance how he was affected by Mr. Stratton's actions. Wherefore Grievant request [sic] that this [sic] Chief Hearing Exam. Reverse the findings of the Facility Mngr. [sic] and remand the grievance back to be processed and answered.

(Doc. 1-16 at 15; Doc. 1 at 13.)

Through a document dated January 13, 2023, the Secretary's Office of Inmate Grievances & Appeals ("SOIGA") dismissed the appeal because it was untimely filed. (Doc. 1 at 13; Doc. 1-16 at 16.) Marsh contested the dismissal of his appeal to SOIGA via a letter dated January 20, 2023 (Doc.

1-16 at 19; Doc. 1 at 13); however, SOIGA stood by its dismissal via a document dated February 17, 2023. (Doc. 1-16 at 18.)

Marsh wonders why Stratton and others need his "essential documents" when they are "already on record." (Doc. 1 at 8–9.) He points to a October 22, 1998 letter from the Commonwealth of Pennsylvania Department of Education which shows his "GED I.D. No." and date of birth. (*Id.* at 9; Doc. 1-11 at 2.) Marsh asserts that Stratton and others are trying to misappropriate and receive government funds to which they are not entitled to. (Doc. 1 at 9.) He notes that he has never been employed and never asked for or requested unemployment funds. (*Id.*) As for Johnson, Marsh alleges that his contact at the Board of Pardons is K. Callear and not Johnson. (*Id.* at 11.) Marsh claims to not know Johnson. (*Id.*)

Overall, Marsh avers that he was the subject of cruel and unusual conduct that is conscious shocking. (*Id.* at 14.) He describes this conduct as "a clever ploy" to keep him believing that his release was pending, which "suspend[ed] any action" from him. (*Id.*) He goes on to assert that:

> The mental and the emotional toll that has to be endured and sorted out and then presented for address is a form of agony – a mental anguish. A spiritual anguish that is physically debilitating. This con, this ploy, this ruse, employed [sic] enacted by D.O.C [sic] official(s) where one expects aid – [sic] assistance – [sic] help – [sic] relief but gets none of what is expected. But gets an excessive cruelty, inordinate, a disregard for (my) life. Seeking monetary gain in their life and the expense of my life, by damning

me. Remember – [sic] change your plea – [sic] then we can help you – [sic] by damning me – [sic] trying to by my own word, by assuming my, by stealing my identity.

(*Id.*) He also claims that DOC officials confiscated all his trial transcripts. (*Id.* at 12–13; Doc. No. 1-6 at 2.)

Based on these allegations, Marsh asserted causes of action under 42 U.S.C. §1983 against Defendants in their official and individual capacities for violations of his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Id.* at 12, 14, 15.) He also appeared to assert claims under "18 USC 1519" and "Pa Rules 4910 – 4911 – (4912) – 5301 – 5303." (*Id.* at 14.) For relief, Marsh requested a declaratory judgment, injunctive relief "compelling defendants to provide [him] with relief from unlawful custody,"[4] and various forms of monetary relief. (*Id.* at 15.)

---

[4] To the extent Plaintiff requests release from custody, the Court cannot grant him this relief as "to the extent that [Plaintiff] is seeking dismissal of the charges against him as a result of constitutional violations, he is essentially asking for relief only available through habeas corpus." *Duran v. Weeks*, 399 F. App's 756, 759 (3d Cir. 2010). This civil complaint is not the appropriate vehicle for Plaintiff to seek habeas corpus relief. If Plaintiff seeks habeas relief, he must do so through a separate petition for a writ of habeas corpus. This Court's Local Rules require that a *pro se* litigant, like Plaintiff, use the standard form supplied by the Clerk of Court when filing a writ of habeas corpus. L.R. 83.32.1. Because habeas corpus actions and non-habeas corpus actions have different filing fee requirements, different pleading standards, and different substantive standards, it is generally inappropriate to bring a hybrid action asserting both habeas and non-habeas claims in one case. *Burnam v. Marberry*, 313 F. App'x 455, 456 n.2 (3d Cir.

*(footnote continued on next page)*

Along with his complaint, Marsh applied for leave to proceed *in forma pauperis* and submitted a prisoner trust fund account statement in support of the application. (Docs. 5, 6.) On June 22, 2023, the Court entered an Order denying Marsh's application because it appeared from his submissions that he had sufficient funds to pay the fees for this action. (Doc. 7.) The Court gave Marsh thirty (30) days to remit the fees. (*Id.*) Marsh timely remitted the fees on July 14, 2023 (Doc. 8.) Five (5) days later, the Court entered an Order directing the Clerk of Court to send waiver of service forms to Defendants. (Doc. 9.)

Defendants waived service and then filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) on September 13, 2023. (Docs. 12, 13.) They filed a brief in support of their motion on September 27, 2023. (Doc. 15.) In response to Defendants' motion and brief, Marsh filed a "Motion to Proceed with Complaint," in which he appeared to argue that the Court should not dismiss his complaint. (Doc. 17.)[5]

---

2009) (noting that the district court should not have considered habeas claims and claims under the Privacy Act and Administrative Procedures Act in a single case); *Forrest v. Sauers*, No. 3:13-cv-0067, 2013 WL 3097569, at *2 (M.D. Pa. June 18, 2013) (Mr. Forrest has presented a hybrid action sounding in both civil rights and habeas. He cannot do so in a singular habeas action as his conditions of confinement claims seek monetary damages and do not call into question his sentence or conviction.")

[5] The Clerk of Court's office appears to have docketed this motion as Marsh's brief in opposition to Defendants' motion to dismiss.

While Defendants' motion to dismiss was being briefed, Marsh filed two motions for appointment of counsel. (Docs. 14, 16.) The Court denied both motions through an Order entered on November 8, 2023. (Doc. 18.)

Approximately a month later, Marsh filed a notice in which he acknowledged receipt of the Court's Order denying his motions for appointment of counsel. (Doc. 19.) He also stated that he had prepared a "response to defendants [sic] brief" but needed to make copies of it first before he could mail it. (*Id.*) Defendants interpreted this filing as a motion for an extension of time to file a brief in opposition to their motion to dismiss, and they filed a brief opposing his request for an extension of time on December 6, 2023. (Doc. 20.)

On December 11, 2023, the Clerk of Court docketed a submission by Marsh in which he referenced filing a counterclaim under Federal Rule of Civil Procedure 7 and pleading fraud or mistake under Federal Rule of Civil Procedure 9(b). (Doc. 21.) Despite these references to the Federal Rules of Civil Procedure, the submission itself appeared to be his brief in opposition to Defendants' motion to dismiss. (*Id.*)

On February 1, 2024, Marsh filed a motion to supplement his complaint and a supporting brief. (Docs. 22, 23.) Through these filings, Marsh wanted to provide "a more clear view of [his] factual claim in the matter of fraud/ [sic]

- 16 -

of everything false that is before the Court, that violates [his] 4th, 5th, 8th, and 14th Amendments [sic] of constitutional rights." (Doc. 23 at 1.)

Marsh filed a motion to compel discovery on July 2, 2024, and a brief in support of the motion on July 12, 2024. (Docs. 27, 28.) These filings compelled Defendants to file a motion to stay discovery pending the disposition of their motion to dismiss and a supporting brief. (Docs. 29, 30.)

On August 12, 2024, Plaintiff filed a motion for summary judgment. (Doc. 32.) On December 10, 2024, he filed a statement of the amount of damages and demand for judgment. (Doc. 33.)

## II.   LEGAL STANDARD

### A.   Motions to Dismiss Under Rule 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). Thus, a complaint that contains only "labels and conclusions," or a "formulaic recitation of the elements of a cause of action" is insufficient. *Id.*

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Facial plausibility is achieved "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility does not require probability but "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "merely consistent with" liability do not satisfy this standard. *Id.*

While the Court at this stage accepts the complaint's factual allegations as true, the Court does not do so to a plaintiff's legal conclusions. *See id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). In addition, "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

This federal pleading standard requires district courts to conduct the following analysis when addressing a motion to dismiss a complaint:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's

well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to show such an entitlement with its facts.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (internal citations and quotations omitted).

"To decide a motion to dismiss, courts generally consider only the allegations contained the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *accord Levins v. Healthcare Revenue Recovery Grp.*, 902 F.3d 274, 279 (3d Cir. 2018). In addition, "a court may consider an undisputedly authentic document that the defendant attaches as an exhibit to a motion to dismiss if the plaintiffs claims are based on that document." *Pension Benefit Guar. Corp.*, 998 F.2d at 1196.

*Pro se* filings must be construed "liberally." *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021). That means that the Court should "remain flexible," and "apply the relevant legal principle even when the complaint has failed to name it." *Id.* It does not mean, however, that *pro se* litigants may "flout procedural rules—they must abide by the same rules that apply to all other litigants." *Id.* Thus, "pro se litigants still must allege sufficient facts in their

complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

### B.    Screening Under 28 U.S.C. §1915A

Under 28 U.S.C. §1915A, a district court is obligated to screen a civil complaint "in which a prisoner seeks redress from a governmental entity or an officer or employee of a governmental entity." 28 U.S.C. §1915A(a); *James v. Pa. Dep't of Corr.*, 230 F. App'x 195, 197 (3d Cir. 2007) (unpublished) ("As James' complaint named governmental officers and employees as defendants, the district court carried out its obligation to screen the complaint under 28 U.S.C. §1915A . . . ."). While such screening should be done "as soon as practicable after docketing," a district court is not precluded from conducting such screening after an answer is filed. *See Lair v. Purdy*, 84 F. App'x 413, 414 (5th Cir. 2003) (unpublished) (rejecting plaintiff's argument that district court erred in screening his complaint and dismissing several of his claims under Section 1915A despite defendants having already answered his complaint because Section 1915A "does not provide that screening may not be performed after an answer is filed"); *Janowski v. Williams*, No. 12-cv-3144, 2015 WL 4171727, at *2 n.1 (D.N.J. July 10, 2015) ("The Court notes that Plaintiff's Amended Complaint has not been screened pursuant to [Section] 1915A, and the fact that Defendants

have filed answers or dispositive motions in response to the complaint does not preclude this Court from screening the Amended Complaint at a future date." (citations omitted)); *Loving v. Lea*, No. 13-cv-158, 2013 WL 3293655, at \*1 (M.D. La. June 28, 2013) ("A §1915A dismissal may be made at any time, before or after service of process and before or after an answer is filed."). The district court must dismiss the complaint if it "fails to state a claim upon which relief may be granted." 28 U.S.C. §1915A(b)(1). In considering whether the complaint fails to state a claim, a district court applies the same standard applied to motions to dismiss under Rule 12(b)(6). *See Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010).

## III.    DISCUSSION

### A.    Claims that Pre-Date 2021

Defendants contend that to the extent Plaintiff purports to bring claims based on alleged conduct that occurred more than two years prior to the filing of the instant action, such claims should be barred by the applicable statute of limitations. The Court agrees.

The Third Circuit "permits a limitations defense to be raised by a motion under Rule 12(b)(6) only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal citation and

quotation marks omitted). "However, if the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Id.* (internal citation and quotation marks omitted). In *Wallace v. Kato*, the United States Supreme Court held that, in §1983 cases, such as the one presented here, courts are to apply the statute of limitations "of the state in which the cause of action arose." 549 U.S. 384, 387 (2007); *see also Owens v. Okure*, 488 U.S. 235, 239 (1989) (advising, in the context of 42 U.S.C. §1983, that, when Congress has failed "to provide a specific statute of limitations[,]" federal courts are to apply the most analogous statute of limitations, unless doing so is inconsistent with federal law or policy (citation, internal citation, and internal quotation marks omitted)). The Third Circuit has since reiterated and relied upon that formulation. *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 602 (3d Cir. 2015); *Est. of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 859 (3d Cir. 2014); *Kach v. Hose*, 589 F.3d 626, 639 (3d Cir. 2009)); *accord Moore v. Walton*, 96 F.4th 616, 623 (3d Cir. 2024). In Pennsylvania, there is a two (2)-year statute of limitations period for personal injury claims. See 42 Pa. C.S. §5524; *see also Kach*, 589 F.3d at 634.

While Pennsylvania law governs the length of the limitations period, "federal law governs a cause of action's accrual date." *Kach*, 589 F.3d at

634; *see also Genty v. Resolution Trust Corp.*, 837 F.2d 899, 919 (3d Cir. 1991). "Accrual is the occurrence of damages caused by a wrongful act—when a plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Dique v. New Jersey State Police*, 603 F.3d 181, 185 (3d Cir. 2010) (citation and internal quotation marks omitted). Particularly relevant here, a "cause of action accrues even though the full extent of the injury is not then known or predictable." *See Wallace*, 549 U.S. at 391 (citations and internal quotation marks omitted). Indeed, "[w]ere it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute ... in the sole hands of the party seeking relief." *See id.* Thus, "[u]nder federal law, a cause of action accrues when the plaintiff knew or should have known of the injury upon which the action is based." *See Montanez v. Sec'y Pennsylvania Dep't of Corr.*, 773 F.3d 472, 480 (3d Cir. 2014) (citations and internal quotation marks omitted); *see also Kach*, 589 F.3d at 634 (explaining that "[t]he determination of the time at which a claim accrues is an objective inquiry; [courts] ask not what the plaintiff actually knew but what a reasonable person should have known" (citation omitted)).

Applying these principles here, the Court agrees with Defendants that any of Plaintiff's claims, to the extent they have accrued prior to June 1st,

2021 (the date that precedes the commencement of the present action by two years), are barred by the applicable statute of limitations. Specifically, any claims relating to the appeal of Plaintiff's PCRA petition, which was granted by a Pennsylvania state court on February 26, 2003, (Doc. 1-14), and a September 19, 2018 filed grievance requesting legal boxes on, which was denied, (Doc. 1-16), are time barred. Plaintiff was on notice at the time the alleged conduct occurred to file a claim, effectively establishing relevant accrual dates for the purposes of the statute of limitations. The complaint puts forward no facts demonstrating that the DOC obstructed Plaintiff's ability to file a claim, and the fact that he has not filed any claim within the statute of limitations period means he may not do so now. Accordingly, to the extent the complaint sets forth any claims related to these events, they will be dismissed.

**B.    Claims against Defendants Harry (DOC Secretary), Johnson, and Rivello**

Defendants contend that because Plaintiff fails to sufficiently allege facts that demonstrate that Defendants Harry, Johnson, and Rivello were personally involved in the acts he claims violated his rights, the claims against them should be dismissed. The Court is constrained to agree.

Section 1983 is the vehicle for plaintiffs to seek redress for the deprivation of federally protected constitutional rights, such as those provided by the First, Eighth and Fourteenth Amendments. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. §1983. "Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors." *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996)).

To establish personal liability against a defendant in a §1983 action, the state actor must have played an affirmative part in the alleged misconduct in order to be subject to liability. *Rizzo v. Goode*, 423 U.S. 362 (1976); *Chavarriaga v. New Jersey Department of Corrections*, 806 F.3d 210, 222 (3d Cir. 2015); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.

- 25 -

1988); *Chincello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986). In essence, the state actor must have a personal involvement.

Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence; however, "[a]llegations of knowledge and acquiescence must be made with appropriate particularity." *Rode*, 845 F.2d at 1207. Additionally, a plaintiff must show that "some affirmative conduct by the supervisor played a role in the discrimination." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990); *see also Rizzo*, 423 U.S. at 377 (1976) (supervising officials do not violate the constitutional rights of the victims unless they have played an "affirmative part" in the misconduct). It is insufficient to survive a motion to dismiss for a complaint by merely hypothesizing about a defendant's personal involvement without any factual support, nor is it required for a court to assume that the plaintiff can use the discovery process to prove facts not alleged. *Evancho v. Fisher*, 423 F.2d 347, 353-354 (3d Cir. 2005). Furthermore, the denial or nonresponse to an inmate request or grievance is insufficient to show personal involvement. *See e.g., Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020); *Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) (noting a prison official's involvement in the grievance process, is not personal involvement in the underlying incident).

Here, Plaintiff seeks to hold Dr. Laurel Harry (DOC Secretary), Johnny Johnson of the Parole Board and Superintendent Rivello liable under the Eighth Amendment for directing Stratton's actions, failing to provide copies of a grievance Plaintiff allegedly filed in 2021, and refusing appeal of his grievance. However, upon review of the complaint and attached exhibits, this Court finds that Plaintiff failed to allege sufficient facts demonstrating the personal involvement of these Defendants.

First, none of these Defendants participated in the meeting between Plaintiff and Defendant Stratton where Plaintiff was invited to apply for Commutation/Pardon Process nor in the handling of his birth certificate and social security Card. Second, whether these Defendants held a supervisory role over Stratton, alone, is insufficient to constitute a §1983 claim. *Rode*, 845 F.2d at 1207 (a §1983 claim cannot be premised on a traditional theory of *respondeat superior*). Rather, §1983 supervisory liability is available when: (1) the supervisor personally "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in [their] subordinates' violations"; or (2) policymakers are shown to have acted with deliberate indifference when "establish[ing] and maintain[ing] a policy, practice or custom which directly caused [the] constitutional harm.'" *See A.M. ex rel. J.M.K. v. Luzerne Cty.*

*Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Here, Plaintiff does not specify any policies, customs, or practices any of these Defendants maintained nor does he show how any of these Defendants participated in violating his constitutional rights, directed others to violate them, or, as the people in charge, had knowledge of and acquiesced to their subordinates' violation and had "some affirmative conduct … play[ ] a role in the discrimination." *Andrews*, 895 F.2d at 1478. As correctly noted by Defendants, Plaintiff's complaint does not contain any suggestion that Harry or Johnson had contemporaneous, personal knowledge of his purported release or his grievance #1003657. Neither has Plaintiff alleged any facts that would indicate that Harry or Johnson individually directed his release or knew of or acquiesced in it. And as to Rivello, Plaintiff alleges he is liable for having affirmed the denial of his tardy grievance filed almost a year after his meeting with Stratton on October 27, 2021. However, such liability will not attach as a state prisoner's allegation that prison officials and administrators responded inappropriately or failed to respond to a prisoner's complaint or grievance, is insufficient to establish personal involvement in the underlying unconstitutional conduct. *See Rode*, 845 F.2d at 1207-1208 (concluding that after-the-fact review of a grievance is insufficient to demonstrate the actual knowledge necessary to establish personal involvement); *Simonton v.*

*Tennis*, 437 F. App'x 60, 62 (3d Cir. 2011) ("[A] prison official's secondary review of an inmate's grievance or appeal is not sufficient to demonstrate the personal involvement required to establish the deprivation of a constitutional right"); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006). Accordingly, the claims against Defendant Rivello, as well as against Defendants Harry and Johnson, will be dismissed.

### C.   Claims against Defendant Stratton

Defendants contend that Plaintiff fails to make out a claim for Fourth, Eighth, or Fourteenth Amendment violations against Stratton because Stratton's conduct does not rise to the level of a constitutional violation. The Court again is constrained to agree.

### i.   <u>Fourth Amendment Claim</u>

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The prohibitions contained within the Fourth Amendment are applicable to the states by virtue of the Due Process Clause

of the Fourteenth Amendment. *Cady v. Dombrowski*, 413 U.S. 433, 440 (1973).

To the extent that Marsh alleges that the seizure of his property (his birth certificate and social security card) violates the Fourth Amendment, courts have repeatedly held that the Fourth Amendment is not applicable to the contents of a prisoner's cell. *See Hudson v. Palmer*, 468 U.S. 517, 530 (1984) ("prisoners have no legitimate expectation of privacy and ... the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells"); *Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001) ("The defendants correctly assert that prisoners do not have a Fourth Amendment right to privacy in their cells.") (citing *Hudson*, 568 U.S. at 529). Such contents include a birth certificate and a social security card. In *Hudson*, the Supreme Court found that loss of freedom of choice and privacy are in inherent incidents of confinement. 468 U.S. at 528 (holding that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell"). Accordingly, Defendants' motion to dismiss the Fourth Amendment claim will be granted.

### ii.    Eighth Amendment Claim

"The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual

- 30 -

punishments.'" *Glossip v. Gross*, 576 U.S. 863, 876 (2015). In order "[t]o determine whether prison officials have violated the Eighth Amendment, [courts] apply a two-prong test: (1) the deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities'; and (2) the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'" *See Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Regarding the first prong, life's necessities include food, clothing, shelter, medical care, and reasonable safety. *See Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 418 (3d Cir. 2000) (stating that "when the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety" (citation omitted)). Regarding the second prong, a prison official does not act with deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety"—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *See Farmer*, 511 U.S. at 837; *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (explaining that the

official "must actually be aware of" the existence of the substantial risk and that "it is not sufficient that the official should have been aware" (citing *Farmer*, 511 U.S. at 837–38)).

Having carefully reviewed the allegations, the Court finds that Plaintiff has failed to establish that he has been subject to cruel and unusual punishment. First, Plaintiff has not shown that his basic needs were left unsatisfied by not being able to retain his birth certificate and social security card in his cell. He was never denied room, food, shelter or other necessities. *Tillman*, 221 F.3d at 418. Furthermore, the "clever ploy" by Defendant Stratton to keep Plaintiff believing that his release was pending does not qualify as a deprivation that is 'objectively, sufficiently serious" that would "result in the denial of the minimal civilized measure of life's necessities'". *Porter*, 974 F.3d at 441. Second, Plaintiff has failed to satisfy the second prong of the test because he has not shown a deliberate indifference on the part of Defendant Stratton. In essence, Plaintiff fails to allege that Stratton had knowledge of any potential danger or substantial risk of serious harm to Plaintiff by retaining copies of his birth certificate and social security card in his legal file. The conduct alleged is compliant with the minimum requirements for inmate prison admissions, which necessitate the obtainment of basic personal information for identification and classification

purposes. 37 Pa. Code §95.222. As noted by Defendants, the Pennsylvania DOC provides a mechanism for inmates to obtain duplicate social security cards and birth certificates upon release. *See* Section 5 of the Commonwealth of Pennsylvania Department of Corrections Reentry and Transition Policy Statement*,* pp. 32-34. https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/07.03.01%20Inmate%20Reentry%20and%20Transition.pdf, last visited on March 25, 2025. Furthermore, Plaintiff has not set forth well-pleaded facts that Defendant Stratton knew of and disregarded an excessive risk to Plaintiff's health and/or safety by informing Plaintiff that he had an opportunity for release by applying for a pardon. Accordingly, for all of these reasons, the Court concludes that Plaintiff's complaint fails to state an Eighth Amendment claim upon which relief can be granted. As such, this claim will be dismissed.

### iii.    **Fourteenth Amendment Claim**

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law[.]" *See* U.S. Const. amend. XIV, §1. In order to determine whether procedural due process requirements apply, the Court must first consider whether the "property" interest asserted is one that is protected by the Fourteenth

Amendment. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570–71 (1972) (stating that, in order "to determine whether due process requirements apply in the first place, [courts] must look not to the weight but to the nature of the interest at stake[,]" and thus, courts "must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property" (internal citation and quotation marks omitted)). The nature of the interest asserted here is that prison officials allegedly deprived Plaintiff of personal property in his cell—his social security card and birth certificate.

It is well-established, however, that the negligent deprivation of property by a state official does not give rise to a cognizable due process claim. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) (providing that the negligent acts of state officials causing unintentional loss of or injury to life, liberty, or property do not violate the Due Process Clause of the Fourteenth Amendment); *Allen v. Cooper*, 140 S. Ct. 994, 1004 (2020) (stating that "a merely negligent act does not 'deprive' a person of property" within the meaning of the Due Process Clause (citing *Daniels*, 474 U.S. at 328)); *Johnson v. City of Philadelphia*, 975 F.3d 394, 402 (3d Cir. 2020) (stating that " 'the Due Process Clause is simply not implicated by a <u>negligent</u> act of an official causing unintended loss of or injury to life, liberty, or property' " (quoting *Daniels*, 474 U.S. at 328) (emphasis in original)).

- 34 -

It is further established that the intentional deprivation of property by state officials also does not give rise to a cognizable due process claim if the plaintiff has an adequate post-deprivation remedy available under state law. *See Hudson*, 468 U.S. at 533 (providing that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation [sic] remedy for the loss is available"); *Allen*, 140 S. Ct. at 1004 (explaining that a deprivation of property "must be intentional, or at least reckless, to come within the reach of the Due Process Clause[,]" and that "[a] State cannot violate that Clause unless it fails to offer an adequate remedy for [a deprivation], because such a remedy itself satisfies the demand of 'due process' " (citation and internal citation omitted)).

With respect to post-deprivation remedies in the prisoner context, the United States Court of Appeals for the Third Circuit has held that the DOC's administrative grievance system constitutes an adequate post-deprivation remedy. *See, e.g., Monroe v. Beard*, 536 F.3d 198, 209–10 (3d Cir. 2008) (finding that prison official-defendants who had confiscated legal materials belonging to the prisoner-plaintiffs did not violate the Due Process Clause, in part, because the DOC's grievance procedure provided an adequate post-

deprivation remedy); *Tillman*, 221 F.3d at 422 (finding that the prisoner-plaintiff had an adequate post-deprivation remedy in the county correctional facility's grievance program, thereby satisfying due process).

In addition to the DOC's grievance system providing an adequate post-deprivation remedy, it has also been held that Pennsylvania tort law provides an adequate remedy for prison officials' unlawful deprivation of inmate property. *See* 42 Pa. Cons. Stat. Ann. §8522(a), (b)(3) (waiving sovereign immunity for negligent acts related to the "care, custody or control of personal property in the possession or control of Commonwealth parties ..."); *Mayo v. Hollibaugh*, 2020 WL 1467257, at *6 (M.D. Pa. Mar. 26, 2020) (explaining that even if the prison's grievance procedures "were constitutionally inadequate, [the prisoner-plaintiff] could take advantage of state tort law which may serve as an adequate post-deprivation remedy" (citing 42 Pa. Cons. Stat. Ann. §8522(a), (b)(3))); *Hernandez v. Corr. Emergency Response Team*, 771 F. App'x 143, 145 (3d Cir. 2019) (unpublished) (explaining that "[e]ven if the prison grievance procedures could be considered constitutionally inadequate, Pennsylvania's state tort law would [still] provide an adequate remedy" (citing 42 Pa. Cons. Stat. Ann. §8522(b)(3))).

Applying these principles here, the Court finds that, to the extent the complaint claims that Defendant Stratton negligently deprived Plaintiff of his personal property, Plaintiff's allegations do not give rise to a cognizable Fourteenth Amendment due process claim. *See Daniels*, 474 U.S. at 328; *Allen*, 140 S. Ct. at 1004; *Johnson*, 975 F.3d at 402. Additionally, the Court finds that, to the extent Plaintiff's complaint claims that Defendant Stratton intentionally deprived him of his property, Plaintiff's allegations do not give rise to a cognizable due process claim because Plaintiff acknowledges that he filed a grievance and, thus, had an adequate post-deprivation remedy available to him. *See Hudson*, 468 U.S. at 533; *Monroe*, 536 F.3d at 209–10; *Tillman*, 221 F.3d at 422. Plaintiff did not file a grievance against Stratton until October 26, 2022, which was rejected as untimely because it was not submitted within fifteen (15) working days after the meeting with Stratton but almost a year afterwards. Plaintiff continued to appeal the rejection until SOIGA made a final disposition of his claim on January 13, 2023. (Doc. 1-16). Accordingly, the Court concludes that Plaintiff's complaint fails to state a Fourteenth Amendment claim upon which relief can be granted. As a result, this claim will be dismissed.

## C.    Fifth Amendment Claim

In his complaint, Plaintiff asserts violations of his Fifth Amendment rights. The Fifth Amendment provides, in pertinent part, that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law[.]" *See* U.S. Const. amend. V. The provisions of the Fifth Amendment only concern, however, federal action, not state or private action. *See, e.g., Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (explaining that "[t]he Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law' "); *Nguyen v. U.S. Cath. Conf.*, 719 F.2d 52, 54 (3d Cir. 1983) (stating that "[t]he limitations of the [F]ifth [A]mendment restrict only federal governmental action and not the actions of private entities") (citing *Public Utilities Commission v. Pollak*, 343 U.S. 451, 461 (1952)); *Nemeth v. Off. of Clerk of Superior Ct. of New Jersey*, 837 F. App'x 924, 929 n.5 (3d Cir. 2020) (unpublished) (noting that the district court had properly concluded that, because all of the named defendants were state and private officials and entities, the plaintiff could not pursue a Fifth Amendment claim against any of them because the Fifth Amendment's due process clause only "protects against federal governmental actions, not state actions").

Here, all the defendants are employees of the DOC who are alleged to have worked at SCI Huntingdon during the period of time relevant to Plaintiff's claims. These Defendants are, therefore, state employees, not federal employees. Thus, to the extent that Plaintiff's complaint asserts a Fifth Amendment due process claim against these state-Defendants, the Court finds that this claim fails to state a claim upon which relief can be granted. As a result, this claim will be dismissed.

### D. FTCA Claims

In the form complaint filed, Plaintiff placed a checkmark and a question mark for the box indicating that he was (or may be) pursuing a negligence action against the United States government under the Federal Tort Claims Act (FTCA), 28 U.S.C. §1346. (Doc. 1 at 1.) "[T]he FTCA waives the sovereign immunity of the United States in its district courts for tort claims 'caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances [in which] the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Lomando v. United States*, 667 F.3d 363, 372 (3d Cir. 2011) (quoting 28 U.S.C. §1346(b)(1)) (alterations in original). It "'does not itself create a substantive cause of action against the United States;

rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court.'" *See id.* (quoting *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 264 F.3d 344, 362 (3d Cir. 2001)); *CNA v. United States*, 535 F.3d 132, 141 (3d Cir. 2008) (explaining that "'[t]he cause of action in an FTCA claim ... must come from state tort law" (citation omitted)).

Here, Plaintiff is a state prisoner who has sued numerous individuals, all of whom appear to work for the DOC, a state agency. In addition, Plaintiff seeks relief from these individuals based upon alleged violations of his constitutional and federal rights that occurred at SCI Huntingdon, a state correctional institution. Thus, the Court treats Plaintiff's complaint as one filed under Section 1983, not the FTCA. *See Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017) (explaining that Section 1983 "entitles an injured person to money damages if a state official violates his or her constitutional rights"). As such, any claims asserted under the FTCA will be dismissed.[6]

---

[6] Dismissal is made pursuant to 28 U.S.C. §1915A(a) because the Defendants do not raise the issue in their motion to dismiss.

### D.    Leave to Amend

The final issue is whether Plaintiff should be granted leave to amend his complaint. Due to the applicable liberal pleading standard, a plaintiff should generally be granted leave to amend before a Court dismisses a claim that is merely deficient. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). The Federal Rules of Civil Procedure allow for amendments to be granted liberally in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits." *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (citation and internal quotation marks omitted).

However, the Court may deny leave to amend where there is "undue delay, bad faith[,] or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment[.]" *See id.* The Court may also deny leave to amend where the proposed amendment would be futile—that is, where the pleading, "as amended, would fail to state a claim upon which relief could be granted." *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002) (citations and internal quotation marks omitted).

In accordance with this standard, the Court finds that granting Plaintiff any further leave to amend his claims against Defendants would be futile, as Plaintiff has submitted detailed allegations, buttressed with exhibits and court documents, and is still unable to state a claim upon which relief can be granted. The particulars of the events from which Plaintiff asserts his claims are clear, and it appears beyond a doubt that no further set of facts would support a claim which would entitle him to relief. As such, Plaintiff will not be afforded leave to amend.

## IV.    CONCLUSION

Based on the foregoing, the Court will **GRANT** Defendants' motion to dismiss **(Doc. 13)** and **DENY** Plaintiff's motion to supplement **(Doc. 22)**, Plaintiff's motion to compel discovery **(Doc. 27)**, Plaintiff's motion for summary judgment **(Doc. 32)** and Defendants' motion to stay discovery **(Doc. 29)** as moot. An appropriate order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 28, 2025**
23-899-01